FILED
2020 May-20  PM 04:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **PAMELA BORDEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **2:18-cv-01547-AKK** |
| **BIRMINGHAM HEART CLINIC, P.C.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

Pamela Borden asserts claims against her former employer, Birmingham Heart Clinic, P.C. ("BHC"), for alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act ("ADA"), and the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"). Doc. 23. According to Borden, BHC discriminated against her by, among other things, failing to provide her with proper training and reasonable accommodations, and retaliated against her after she complained of the discrimination by harassing her and finding that she abandoned her job. *Id.* BHC moves for summary judgment on all of Borden's claims, arguing in part that Borden voluntarily resigned and cannot establish that she suffered an adverse employment action. Docs. 43; 44. Because questions of fact

exist regarding whether BHC failed to provide training to Borden that it provided to an employee outside her protected classes and whether that failure was an adverse employment action, BHC's motion fails as to the race and age discrimination claims based on the alleged failure to train. However, because BHC reasonably believed that Borden voluntarily resigned, and for the additional reasons discussed below, the balance of BHC's motion is due to be granted.

## I.

Before addressing the motion for summary judgment, the court turns first to BHC's motion to strike. Doc. 53. Because motions to strike summary judgment evidence are no longer appropriate,[1] the court construes the motion as objections to the evidence. Under Rule 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," and "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2) advisory committee's notes (2010 amendments).

First, BHC objects to purportedly conclusory statements in Borden's brief on the grounds that Borden did not cite supporting evidence. Doc. 53 at 2-4. Only two of the statements are alleged facts recited in Borden's statement of facts, *see id.*, and,

---

[1] *See* Fed. R. Civ. P. 56(c)(2) advisory committee's notes (2010 amendments) ("There is no need to make a separate motion to strike."); *Campbell v. Shinseki*, 546 F. App'x 874, 879 (11th Cir. 2013).

contrary to BHC's contention, Borden cites evidence to support those statements, *see* doc. 52 at 6, 8.[2]  Thus, BHC's objections are overruled.

Next, BHC contends that Exhibit 11 to Borden's response contains inadmissible hearsay.  "'[A] district court may consider a hearsay statement . . . if the statement could be reduced to admissible evidence at trial . . . .'"  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294-95 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999)).  Exhibit 11 consists in part of typed notes of a conversation between Shae Williams, who worked with Borden at BHC; Carrie Virgona, BHC's Director of Human Resources; and Tonya White, BHC's Practice Administrator.  *See* doc. 52-11.  BHC objects to statements attributed to Williams about her experiences at BHC, contending that Borden cannot reduce the statements to admissible evidence at trial because they are not based on Borden's personal knowledge.  Doc. 53 at 7-11.  This contention is unavailing because Borden may decide to call Williams to testify about these contentions at a potential trial of this matter.  *See Jones*, 683 F.3d at 1295.  Accordingly, BHC's objections to Exhibit 11 are overruled.

---

[2] The remaining purportedly conclusory statements are contained in Borden's arguments, and BHC also objects to statements in Borden's arguments that allegedly misrepresent its employee handbook.  Doc. 53 at 2-6.  Because BHC's response to Borden's arguments are a matter for its reply brief rather than a motion to strike, and the employee handbook speaks for itself, the court does not address BHC's objections to these statements.

The court turns now to the motion for summary judgment.  In Part II, the court will discuss the relevant standard, followed by the statement of facts in Part III.  Part IV is the analysis of the claim, and Part V is the conclusion.

## II.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56. "Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration in original).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact.  *Id*. at 323.  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial."  *Id*. at 324 (citation and internal quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

On summary judgment motions, the court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving

party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970). *See also Anderson*, 477 U.S. at 255. Any factual disputes will be resolved in the non-moving party's favor when sufficient competent evidence supports the non-moving party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276, 1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## III.

BHC provides cardiology and related medical care on an out-patient basis at several locations, including the Vein Center in Trussville, Alabama where Borden worked. Docs. 45-1 at 2-3; 45-6 at 3. BHC employs clinical employees who, among other things, call patients to the back and prepare them for the physicians, and scrub technicians to assist physicians with procedures such as venous ablations. Docs. 45-1 at 4-5; 45-2 at 6, 31; 45-5 at 2. Venous ablations involve the introduction of

catheters into a vein, and during the procedures, a scrub tech threads thin wires into the catheters so the physician can then advance the catheter into the targeted vein. Doc. 45-1 at 3-4.

BHC hired Borden, an African American over the age of forty, as a scrub tech at the Vein Center in February 2018 to replace Tiffany Putnam, a younger Caucasian woman.  Docs. 45-3 at 20; 45-4 at 2; 45-6 at 3.  Borden has diabetic retinopathy, which requires monthly eye injections to prevent loss of her sight.  Doc. 45-3 at 29-30, 51.  Borden disclosed her condition before she began working for BHC.  *Id.* at 29.  According to Borden, her retinopathy made it difficult for her to read a small computer screen, but did not otherwise impact her ability to perform her duties.  *Id.* at 39, 42.

Prior to joining BHC, Borden worked as a medical assistant, and she had no prior experience as a scrub tech or assisting with venous ablations.  Docs. 45-2 at 10-11; 45-3 at 20.  Heather Baynham, a Caucasian woman and the Vein Center Supervisor or Manager, supervised Borden.  Docs. 45-2 at 6; 45-6 at 3; 45-8 at 1-2. Baynham placed Putnam in charge of training Borden.  Docs. 45-3 at 36; 45-6 at 3. However, according to Borden, Putnam did not adequately train her, and when she asked Putnam questions, Putnam responded by stating that she "mentioned that to [Borden] last week" or that she "told [Borden] that yesterday."  Doc. 45-3 at 35, 43. Although Borden complained to Baynham about the lack of adequate training,

nothing changed.  *Id.* at 43, 47.  In light of Putnam's purported failures, Borden also sought help from Taylor Smith and Chandley Buttram, two younger, Caucasian co-workers.  *Id.* at 36, 43.  However, they refused also to help Borden.  *Id.*  Shae Williams, another African-American scrub tech, also reported that she did not receive proper training.  Doc. 52-11 at 5.  According to Williams and Borden, Baynham provided Morgan Cantrell, a younger Caucasian woman, more training than they received.  Docs. 52-11 at 5; 45-3 at 43.

Borden alleges also that her co-workers began harassing her soon after she started working.  Doc. 45-3 at 34.  For example, her Caucasian co-workers discussed how Williams, the only other African-American employee, did not take the job seriously and seemed disinterested because she did not ask questions.  *Id.* at 35. Thus, to prevent appearing disinterested, Borden asked many questions, but no one would answer them.  *Id.*  Then, on the first Monday Borden worked at BHC, Smith shut down the computer after she clocked in instead of allowing Borden to clock in, and "everybody" walked away laughing.  *Id.*  On other occasions, Putnam, Smith, and Brittany Roden, another Caucasian co-worker, walked out of a room after Borden walked in, and Williams told Borden to "[g]et used to it" because "this is the way they treat you."  *Id.* at 36.  In addition, Borden's co-workers commented that she was too old to start a new job and that she might have trouble keeping up.  *Id.* at 35-36.  Borden complained to Baynham almost every other day about her co-

workers' behavior, and after Baynham spoke to the other employees, "things got a little worse." *Id.* at 39, 42.

In late April 2018, Borden met with Tonya White, BHC's Practice Administrator, to complain about harassment from Baynham and her co-workers. Docs. 45-3 at 42. Borden reported that her co-workers talked to her "in a very harsh way," that Baynham treated her harshly in front of a patient for something another employee did, and that every time she reported her co-workers' behavior, "things started getting worse." *Id.* Borden also relayed that she needed more training and that she and Williams received different training than the Caucasian employees. Doc. 45-2 at 33.

Based on the meeting, White suggested that Borden transfer to a clinic position. *Id.* White believed the clinic position was in Borden's "wheelhouse" and that Borden would perform better in that position. Docs. 45-2 at 33; 45-3 at 43. Accordingly, that same month, BHC transferred Borden to a clinic position. Doc. 45-6 at 3. Borden's pay remained the same, and Baynham continued to supervise Borden. Docs. 45-2 at 63; 45-6 at 3-4. In addition, Borden continued to interact with the same co-workers who allegedly harassed her before the transfer. Doc. 45-2 at 63.

In early April 2018, Borden asked Tavares McElrath if BHC's Nuclear Center where McElrath worked had any openings. Docs. 45-3 at 33; 45-7 at 2-3; 52-14 at

2.  McElrath replied that they might have an opening for an experienced stress tech, and directed Borden to White.  *Id.*  Sometime thereafter, White informed Borden there were no current openings in the Nuclear Center, and Borden in turn expressed that she wanted to transfer to a different position at BHC.  *See* doc. 45-3 at 33.  And, although BHC had an open position for a medical assistant in the Nuclear Center in late April when Borden met with White to complain about her co-workers' harassing behavior, in response to Borden's request for a transfer to a different position, BHC transferred Borden instead to the clinic position at the Vein Center.  Docs. 45-2 at 33; 45-3 at 34; 45-6 at 3.[3]  At some point in late April, Borden also asked Pam Wynn, BHC's Office Manager, for a transfer to another location.  *See id.*

Early in the morning on May 23, 2018, Borden called Baynham to report that "the Vein Center is not for [her]" and that she "would not be back to the Vein Center."  Doc. 45-3 at 47.  Borden did not report to work that day.  *See id.*  After calling Baynham, Borden called Wynn to relay that she "was having such an anxiety attack that [she] could not go back down to the Vein Center" because of the retaliation and hostile environment.  *Id.*  Borden told Wynn she was not quitting, but that BHC had "to find [her] another place" to work than the Vein Center.  *Id.* at 48.

---

[3] BHC contends that Borden lacked the required experience for the position at the Nuclear Center. *See* doc. 45-2 at 29.  Borden disagrees, citing her EKG work as proof of her qualification for the position at the Nuclear Center.  *See* doc. 52 at 7; 45-3 at 13-14.

According to Borden, Wynn told Borden to stay home, and asked Borden if she would meet with Dr. Andrew Brian, a member of BHC's executive committee, to discuss her experience at the Vein Center.  *Id.* at 47.  Thereafter, White and Carrie Virgona, BHC's Director of Human Resources, called Borden, and Borden told them that she would not return to the Vein Center because of the discriminatory and harassing conduct.  Doc. 45-6 at 4.

Borden met with Dr. Brian, Amanda Mulvehill (BHC's Clinic Director), and Wynn two days later.  Docs. 45-2 at 34; 45-3 at 47.  Borden believed that BHC convened the meeting for her to tell Dr. Brian about her experiences at the Vein Center.  Doc. 45-3 at 47.  Indeed, Dr. Brian apologized for the harassment Borden had endured.  *Id.* at 47-48.  But, at the beginning of the meeting, Wynn gave Borden an exit interview form to complete.  *Id.*  Borden expressed surprise at the form, informing Wynn of her belief that she was asking for a transfer rather than quitting her job.  *See id.* at 48-49.  Wynn told Borden to "just fill [it] out . . . ."  *Id.* at 49. Borden completed the exit interview form as requested, indicating that she was resigning due to dissatisfaction with her supervisor, co-workers, and working conditions.  Doc. 45-10 at 2.

After the meeting, when Borden called Wynn to inquire about her transfer request, Wynn told Borden that BHC's executive committee would meet to discuss Borden's job.  *See* doc. 45-3 at 49.  The executive committee subsequently

determined that Borden quit or abandoned her job and was ineligible for rehiring. *See* docs. 45-2 at 48; 45-3 at 49.  As a result, White and Wynn informed Borden that BHC decided that Borden "had abandoned [her] job, and since [Borden] quit without a two weeks' notice that [she] would not be eligible for rehire."  Doc. 45-3 at 49. Thereafter, a younger Caucasian woman replaced Borden in the clinic position.  Doc. 45-2 at 58-59.

## IV.

Borden asserts claims for race and age discrimination in violation of Title VII, § 1981, and the ADEA, (counts one and four), retaliation in violation of Title VII and § 1981 (count two), and disability discrimination and failure to accommodate in violation of the ADA and ADAAA (count five).[4]

---

[4] Borden also asserts a hostile work environment claims under Title VII and § 1981 (count three). Doc. 23 at 15-17.  But, Borden did not respond to BHC's arguments for summary judgment on that claim.  *See* doc. 52.  "[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."  *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).  Therefore, Borden waived the claim.  Alternatively, the claim fails on the merits.

To establish her hostile work environment claims, Borden must show that BHC subjected her to unwelcome harassment, the harassment was based on her protected status, and the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment.  *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (quotation omitted).  "Either severity or pervasiveness is sufficient to establish a violation of Title VII" and § 1981.  *Id.* (emphasis in original).  Additionally, it is a "bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII [or § 1981]."  *Jones*, 683 F.3d at 1297.  Rather "only conduct that is 'based on' a protected category, such as race, may be considered in a hostile work environment analysis."  *Id.*

Borden alleges BHC subjected her to a hostile work environment based on the following incidents: (1) Smith shut a computer down instead of allowing Borden to clock in, and other employees laughed; (2) co-workers made comments that Borden was too old to start a new job or to keep up, and no one would speak to Borden the morning after she complained to Baynham about the

## A.

The alleged race and age discrimination is limited to these actions:  (1) the decision to transfer Borden to a clinic position, (2) the determination that Borden resigned, and (3) the failure to adequately train Borden.  *See* doc. 23.  Because Borden relies on circumstantial evidence, she may prove her claims using the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248 (1981).  *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330-31 (11th Cir. 1998); *Kragor v. Takeda Pharm. America, Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (citation omitted).  Under that familiar framework, Borden bears the initial burden of establishing a prima facie case by showing she is a "qualified member of

---

comments; (3) Smith told Borden not to use her computer and a phone in a procedure room and wiped down everything Borden touched when Borden left the room; (4) a co-worker told Borden to go back to her previous job; (5) Borden's lunch was thrown away on several occasions; (6) Dr. Thompson called Borden an idiot on one occasion and told her that she needed to learn to count; (7) Baynham spoke harshly to Borden and Williams, but not to Caucasian employees; (8) Putnam told several employees, including Borden, about an incident in which Putnam "had some black guys [] pull up in her driveway, and she ran out with her pistol," and Putnam later told Borden that she did not want Borden to think Putnam is racist; and (9) Caucasian co-workers walked out when Borden walked in to a room, and Williams told Borden to get used to it because it was "the way they treat you." Docs. 52 at 10-11; 45-3 at 35-38. As to the first six incidents, while Borden's co-workers' behavior was immature, churlish, and inappropriate, Borden has not shown that those incidents were motivated by race, and the court cannot consider that behavior in its analysis of Borden's hostile work environment claim. And, even if the court could consider all of the alleged harassing incidents, they are not objectively severe or pervasive enough to alter the terms and conditions of Borden's employment. *See, e.g., Guthrie v. Waffle House*, 460 F. App'x 803, 807 (11th Cir. 2012) (finding that "a few dozen comments or actions . . . spread out over a period of eleven months" was insufficiently frequent); *Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999). Thus, while the harassment caused Borden great distress and is unacceptable in a workplace, it does not give rise to a hostile work environment claim.

a protected class and was subjected to an adverse employment action in contrast to similarly situated employees outside her protected class." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) (citation omitted). But, "'establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case.'" *Lewis v. City of Union city, Georgia*, 934 F.3d 1169, 1185 (11th Cir. 2019) (quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). And, "'the plaintiff will always survive summary judgment if he or she presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" *Id.* (alteration in original omitted). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Lockheed-Martin Corp.*, 644 F.3d at 1328 (quotation omitted).

## 1.

BHC asserts that Borden's race and age discrimination claims fail because Borden cannot show she suffered an adverse employment action. Doc. 44 at 18-21. In particular, BHC contends that Borden voluntarily resigned and that its decisions to transfer Borden to a clinic position and to allegedly not provide Borden adequate training were not adverse employment actions. *Id.* An "'employee must show a

serious and material change in the terms, conditions, or privileges of employment'
so that a 'reasonable person in the circumstances' would find 'the employment
action to be materially adverse.'" *Jefferson v. Sewon America, Inc.*, 891 F.3d 911,
921 (11th Cir. 2018) (quoting *Davis v. Town Lake Park*, 245 F.3d 1232, 1239 (11th
Cir. 2001)) (alteration and emphasis in original omitted).  A voluntary resignation
generally does not qualify, but an employee may show she suffered an adverse action
if her resignation was involuntary.  *See Williams v. Alabama Dep't of Corr.*, 649 F.
App'x 925, 928 (11th Cir. 2016) (citing *Hargray v. City of Hallandale*, 57 F.3d 1560,
1568 (11th Cir. 1995)).  "Two situations warrant deeming an employee's resignation
involuntary:  '(1) where the employer forces the resignation by coercion or duress;[5]
or (2) where the employer obtains the resignation by deceiving or misrepresenting a
material fact to the employee.'" *Rodriquez*, 863 F.3d at 1352 (quoting *Hargray*, 57
F.3d at 1568).

### a.

BHC contends that Borden voluntarily resigned based on evidence that
Borden called Baynham and told her that "the Vein Center was not for [her]" and

---

[5] The Eleventh Circuit has "identified a non-exhaustive list of five factors to guide [the] analysis
into [whether an employee was forced to resign]:  '(1) the employee was given an alternative to
resignation; (2) the employee understood the nature of the choice [s]he was given; (3) the employee
was given a reasonable time in which to choose; (4) the employee was permitted to select the
effective date of the resignation; and (5) the employee had the advice of counsel." *Rodriquez v.
City of Doral*, 863 F.3d 1343, 1352 (11th Cir. 2017) (quoting *Hargray*, 57 F.3d at 1568).

that Borden "would not be back to the Vein Center," doc. 45-3 at 47; *see also* docs. 45-11 at 2-4; 52-9 at 10, and on an exit interview Borden signed indicating that she resigned due to dissatisfaction with her supervisor, co-workers, and working conditions, doc. 45-10 at 2.  Additionally, BHC cites Borden's EEOC charge, where Borden states that she "informed [her] employer that [she] would not be able to return to [her] specific office due to the treatment" she encountered and that she "was called to a meeting to explain the issues and [her] reasons for not returning."  Doc. 45-11 at 2.  Borden acknowledges that she made the call to Baynham and signed the exit interview form, doc. 45-3 at 47, but disputes BHC's characterization of the evidence and that she voluntarily resigned, *id.* at 47-50; doc. 52 at 12-13, 15-18.

Borden argues that BHC forced her to resign because she (1) did not discuss options concerning resignation with Wynn or Dr. Brian, (2) did not understand the purpose of completing the exit interview form, (3) did not have a reasonable time to choose to resign because she was not aware of the purpose of her meeting with Dr. Brian until BHC gave her the exit interview form, and (4) did not have the advice of counsel before she completed the form.  Doc. 52 at 16-18.  These contentions are unavailing and overlook that Borden had already informed Baynham that she would not return to her position <u>before</u> she talked to Wynn or met with Dr. Brian.  Indeed, Borden unambiguously expressed to Baynham that she would not return to the Vein Center, and, in light of her statement to Baynham, Borden testified that she

15

understood that BHC would not schedule her to work at the Center after that conversation. *See* doc. 45-3 at 47-48. Thus, BHC could have reasonably interpreted Borden's statement to Baynham as a resignation.

And, while Borden may have hoped that BHC would transfer her to a different location after she subsequently relayed the reason for her decision, there is no evidence that BHC indicated that it would do so. In fact, Borden admits that she did not know if BHC had any vacancies at its other locations when she made her decision. *Id.* at 48. In addition, it is not objectively reasonable for an employee to expect that she could force her employer to transfer her to a new position by refusing to work in her current position, especially without prior notice of her decision.[6] Consequently, based on the record before the court, Borden has failed to establish that BHC forced her resignation by coercion or duress. As a result, the record supports BHC's contention that Borden voluntarily resigned—albeit because Borden no longer wanted to, or felt she could not, work in an allegedly

---

[6] The court understands that Borden may have felt her refusal to return was reasonable and necessary in light of the discrimination and harassment she believed she experienced at the Vein Center. However, Borden did not plead a constructive discharge claim, *see* doc. 23, or argue constructive discharge in her opposition to BHC's motion, *see* doc. 52. Moreover, the court is not sure that Borden's contentions would rise to such a claim in any event. To prove constructive discharge, Borden must show that her "working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign . . . ." *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004). The alleged conduct Borden describes falls short of the legal standard necessary to show that she suffered harassment and discrimination sufficiently severe or pervasive to alter the terms and conditions of employment. *See* pp. 11-12, n.4, *supra*.

discriminatory and hostile environment.  Thus, her resignation is not an adverse employment action.

### b.

BHC argues next that Borden's transfer from the scrub technician position to a clinic position was not an adverse employment action.  Doc. 44 at 19-20. "Generally, a 'transfer to a different position can constitute an adverse employment action if it involves a reduction in pay, prestige, or responsibility.'" *Ware v. Supreme Beverage Co.*, 927 F. Supp. 2d 1244, 1251 (N.D. Ala. 2013) (quoting *Hinson v. Clinch Cnty., Georgia Bd. of Educ.*, 231 F.3d 821, 828 (11th Cir. 2000)) (alterations in original omitted).  In this case, Borden did not cite to any facts challenging BHC's evidence that her transfer did not result in a loss of pay, and that the clinic position had substantially the same amount of prestige and responsibility as her old position.[7] *See* docs. 45-6 at 4; 52.  Thus, Borden's transfer does not constitute an adverse employment action.

### c.

BHC also contends that any training it purportedly denied Borden was not material or an adverse employment action.  Docs. 44 at 20-21; 54 at 7.  An employee may show she suffered an adverse employment action if her employer denied her

---

[7] Borden asserts without any proof that the clinic position is less prestigious.  Doc. 52 at 31.

material training opportunities. *Johnson v. Gestamp Ala., LLC*, 946 F. Supp. 2d 1180, 1202 (N.D. Ala. 2013) (citing *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1435 n.16 (11th Cir. 1998)).[8] The parties agree that Borden did not have prior experience with the procedures she would have to perform as a scrub technician. Doc. 45-3 at 21. And, Borden testified that she did not get the training she needed, that she complained to Baynham and White, and that although Baynham and White assured Borden she would receive the necessary training, "it never happened." Docs. 45-3 at 42-43, 47; 45-11 at 2; 45-12 at 2; *see also* doc. 45-2 at 33, 45. Despite the alleged lack of training, allegedly, Baynham still belittled Borden for her performance on certain tasks. Docs. 45-11 at 2; 45-12 at 2. For example, although Borden purportedly never received training on preparing the paperwork patients must sign, Baynham "went off about" a mistake Borden made. Doc. 45-3 at 51. In addition, White believed Borden needed more training than she received for the scrub tech position, doc. 45-2 at 62, and BHC eventually transferred Borden to a clinic position based on the belief that Borden would be more successful in that position. All of this evidence, which the court must accept as true, indicates that the lack of training affected Borden's ability to perform her duties as a scrub tech and,

---

[8] *See also Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014), overruled on other grounds by *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016) ("[A] failure or refusal to train an employee based on that employee's membership in a protected class is an adverse action.").

therefore, was material.  As a result, a reasonable jury could find that BHC's failure to train Borden qualifies as an adverse employment action.[9]

But, establishing an adverse employment action is only one part of the prima facie case inquiry.  To prevail, Borden must also show that BHC treated similarly-situated employees outside Borden's protected classes more favorably.  Contrary to BHC's contention otherwise, *see* doc. 44 at 21-22, Borden testified that BHC did not provide adequate training to her or Williams, the only African-American employees at the Vein Center, and that BHC provided more extensive one-on-one training to another scrub technician, Cantrell, a Caucasian woman in her 20s.  *See* docs. 45-3 at 42; 45-11 at 2; 45-12 at 2.  And, Williams also reported that Cantrell received more training than she and Borden did, and that Baynham allegedly "took [Cantrell] into a room, opened packs, and that she had someone pretend to be the patient and let [Cantrell] practice."  Docs. 45-2 at 44; 52-11 at 5.  Construing that evidence in the light most favorable to Borden, a reasonable jury could find that BHC treated similarly-situated employees outside of Borden's protective classes more favorably with respect to training opportunities.

---

[9] *See Bullock v. Widnall*, 953 F. Supp. 1461, 1473 (M.D. Ala. 1996) (finding that a plaintiff had not proved his non-selection for a training course was an adverse employment action when there was no evidence the training "would affect his salary, chances of promotion, [or] ability to perform his job").

**2.**

In summary, Borden has not shown the existence of a question of material fact regarding whether her transfer to a clinic position and her resignation qualified as adverse employment actions.  Thus, Borden's race and age discrimination claims based on her resignation and transfer to a clinic position fail.  However, Borden has shown at least a question of fact regarding whether the alleged failure to adequately train her for the scrub technician position constituted an adverse employment action and whether BHC offered more training to a similarly-situated employee outside her protected classes.  In light of BHC's failure to show that Borden was not qualified for the scrub technician position,[10] a factual dispute exists regarding Borden's prima facie case of race and age discrimination.  Therefore, because BHC has not proffered any non-discriminatory reason for its alleged failure to adequately train Borden, and "[e]stablishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee," *Burdine*, 450 U.S. at 254,[11]  BHC's motion on the failure to provide adequate training claims fails.

---

[10] *See* doc. 45-2 at 27.

[11] BHC relies on *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009), to argue that Borden's age discrimination claim fails because Borden cannot prove that age was the "but-for" cause of any adverse action. Doc. 44 at 22-23.  In *Gross*, the Supreme Court held that "[t]o establish a disparate-treatment claim under the plain language of the ADEA [], a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."  557 U.S. at 176.  But, post-*Gross*, courts in this Circuit still "apply the *McDonnell Douglas* framework to determine whether [the plaintiff] established a prima facie case that age discrimination was the but-for cause of [her] adverse employment action."  *Horn v. United Parcel Servs., Inc.*, 433 F. App'x 788, 793 (11th Cir. 2011)

**B.**

Next, Borden asserts that BHC retaliated against her in violation of Title VII and § 1981 by harassing her and discharging her after she complained of race discrimination.[12]  Doc. 23 at 13-15.  To prevail on these claims, Borden must first establish a prima facie case by showing "that [s]he engaged in statutorily protected activity, [s]he suffered a materially adverse action, and there was some causal relation between the two events."  *Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008) (quotation omitted).  An employee engages in protected activity when she "reasonably believed that [s]he was opposing a violation of Title VII [or § 1981] by [her] employer," *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997), and protected activity includes formal complaints and also informal complaints to a supervisor about discriminatory conduct, *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002) (citing *Rollins v. Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989)).  To satisfy the adverse action element, an employee must show that the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*,

---

(citation omitted); *see also Sims v. MVM, Inc.*, 704 F.3d 1327, 1332-33 (11th Cir. 2013).   Thus, because there are at least questions of fact regarding Borden's prima facie case, BHC has not shown that, as a matter of law, Borden cannot prove but-for causation to support her age claims.

[12] In her Amended Complaint, Borden also pleads a retaliation claim premised on a denial of pay, doc. 23 at 13, but she has abandoned that claim, *see* docs. 45-3 at 26; 52.

548 U.S. 53, 68 (2006) (quotation and internal quotation marks omitted).  Satisfying

the causation element requires an employee to prove that but for the employer's

desire to retaliate, she would not have suffered the adverse employment actions.  *See*

*Booth v. Pasco Cnty.,* 757 F.3d 1198, 1207 (11th Cir. 2014) (citing *Univ. of Texas*

*Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 363 (2013)).  She can prove this

through "sufficient evidence that the decision-maker became aware of the protected

conduct, and that there was a close temporal proximity between this awareness and

the adverse action."  *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 n.30 (11th

Cir. 2003) (citation and alteration in original omitted).

Borden contends she engaged in protected activity on at least three

occasions—when she complained to Dr. Brian, Baynham, and White about alleged

discrimination.  According to Borden, in retaliation for her complaint to Dr. Brian,

BHC effectively discharged her by finding that she abandoned her job.  Doc. 52 at

22.  But, Borden's meeting with Dr. Brian occurred after the alleged retaliatory

harassment and after Borden announced to her supervisor that she would not return

to her job.  *See* doc. 45-3 at 47-48.  Thus, no causal link exists between Borden's

complaints to Dr. Brian and the alleged retaliatory conduct.  *See Austin v. Mac-Lean*

*Fogg Co.*, 999 F. Supp. 2d 1254, 1263 (N.D. Ala. 2014).  Moreover, BHC presented

Borden with the exit interview form at the state of the meeting with Dr. Brian.  Doc.

45-3 at 47-48.  In other words, the decision to construe her conduct as a resignation

was unrelated to the complaint Borden made to Dr. Brian.  Finally, as discussed above, BHC reasonably interpreted Borden's decision not to return to the Vein Center as a voluntary resignation, *see* pp. 14-17, *supra*, and, therefore, BHC's determination that Borden resigned or abandoned her job is not an adverse action that can support a retaliation claim.[13]

Borden also contends that she engaged in protected activity when she complained to White and Baynham about the harassment she faced.  *See* doc. 52 at 11, 25-26.  According to BHC, Borden's complaints to White are not protected activity because Borden did not mention race in her complaints.  Doc. 44 at 32-34. While Borden could not remember if she mentioned race discrimination during her discussions with White, Borden testified that she informed White that her co-workers harassed her and that every time Borden spoke "to anybody about the treatment that [she] was getting, things started getting worse."  Doc. 45-3 at 42.  And, Borden informed White that she and Williams, the only two African-American employees at the Vein Center, received different training than other employees. Doc. 45-2 at 41, 45.  Giving Borden the benefit of the doubt, she relayed sufficient information to White for White to discern the nature of her complaint.

---

[13] Borden does not plead that BHC's decision that she was not eligible for rehire was an adverse employment action, *see* doc. 23, and she cannot amend her claims through arguments in her brief opposing summary judgment, *Lightfoot v. Henry Cnty. Sch. Dist.*, 771 F.3d 764, 779 (11th Cir. 2014) (citation omitted).

Ultimately, however, even if Borden did not inform White about alleged race discrimination, Borden still engaged in protected activity because Borden complained to Baynham "[p]retty much every other day" about the treatment she endured from her co-workers, including an incident in which Cantrell would not allow Borden, unlike her Caucasian co-workers, to use the phone in a procedure room. *See* doc. 45-3 at 38-39, 42. This evidence is sufficient at this stage of the case to establish that Borden's complaints to Baynham are protected activity.

Still, to establish a prima facie case of retaliation, Borden must show that she suffered an adverse employment action as a result of her complaints. *Butler*, 536 F.3d at 1213. To meet this burden, Borden cites the alleged harassment she received after she complained to White and Baynham. Doc. 23 at 13. The Eleventh Circuit recognizes a cause of action for retaliatory hostile work environment. To establish such a claim, Borden must show that the harassment she suffered was "sufficiently severe or pervasive to alter the terms and conditions of employment . . . ." *Gowski v. Peake*, 682 F.3d 1299, 1312, (11th Cir. 2012) (per curiam). But, the harassing behavior Borden complains of does not satisfy that requirement. *See* pp. 11-12, n.4, *supra*. As a result, BHC is entitled to summary judgment on the retaliation claim.

## C.

Borden asserts also a claim for disability discrimination. Doc. 23 at 18-20. To prevail on her claim under the ADA and ADAAA, Borden must show that:

24

(1) she had an actual or perceived disability; (2) she was qualified to perform the essential functions of the job, either with or without reasonable accommodation; and (3) BHC subjected her to an adverse employment action because of her actual or perceived disability. *See Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002). At issue here is whether Borden has an actual or perceived disability.

A physical impairment standing alone—in this case, diabetic retinopathy, *see* doc. 45-3 at 29-30—is not sufficient to prove disability for purposes of the ADA, *Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 911 (11th Cir. 1996) (citations omitted). Instead, Borden must show that her impairment substantially limits a major life activity, such as working, or that she is "regarded as having such an impairment . . . ." *See* 42 U.S.C. § 12102(1). According to BHC, Borden has not identified any major life activity that is substantially limited by her retinopathy. Docs. 44 at 29; 54 at 10. Indeed, Borden testified that she did not have trouble seeing to perform procedures as a scrub tech and that it took her only "a little longer" to read the text on a computer screen when training on the computer. *Id.* at 30, 42, 46. Moreover, Borden has not pointed to any limitations caused by her retinopathy. *See* doc. 52. Therefore, based on this record, Borden does not have an actual disability.

As for Borden's contention that BHC regarded her as disabled, *see* doc. 52 at 28-30, under the ADA, as amended by the ADAAA, "[a]n individual meets the requirement of 'being regarded as having [] an impairment [that substantially limits

25

a major life activity]' if the individual establishes that he or she has been subjected to an action prohibited under [the Act] because of an actual or perceived physical or mental impairment whether or not the impairments limits or is perceived to limit a major life activity."   42 U.S.C. § 12102(3).   Borden contends she satisfies this requirement because BHC knew she had diabetic retinopathy, physicians at the Vein Center believed Borden had difficulty seeing while assisting with venous ablations, and BHC transferred her to the clinic position based on its perception that she had difficulty seeing during procedures.  Doc. 52 at 28-29; *see also* doc. 45-2 at 33, 62. But, as discussed above, Borden's transfer to the clinic position was not an adverse employment action.   *See*, p. 17, *supra*.  Thus, even if BHC transferred Borden because of a perceived disability, the transfer is not sufficient to establish a prima facie case of disability discrimination. *See Williams*, 30 F.3d at 1290.  And, Borden has not pointed to any other action BHC took based on her perceived disability.  *See* doc. 52.  Consequently, in light of Borden's failure to show an adverse action against her based on a perceived disability, the claim fails.

### D.

Finally, Borden asserts that BHC violated the ADA by failing to accommodate her disability.  Doc. 23 at 18-20.  An employer has "an affirmative duty to provide reasonable accommodations for known disabilities, unless doing so would result in undue hardship on the operation of the business."  *Hudson v. Tyson*

*Farms, Inc.*, 769 F. App'x 911, 917 (11th Cir. 2019) (citing 42 U.S.C. § 12112(b)(5)(A)). And, "[a]n employer's failure to provide reasonable accommodation to a disabled individual is itself discrimination . . . ." *Id.* In this case, Borden had difficulty reading text on a regular computer screen, and she asked Baynham if she could work with a bigger screen. Doc. 45-3 at 30. BHC contends that Baynham allowed Borden to use a larger computer screen, and that it provided Borden a reasonable accommodation. Doc. 44 at 30-31. For her part, Borden contends that Baynham only allowed her to use the larger computer screen "sometimes." Doc. 52 at 31.

Borden has failed to meet her burden on her failure to accommodate claim. To begin, Borden offers no specifics. For example, Borden does not say how much access she needed to a bigger computer screen and how much she actually received, or the impact, if any, this had on her job. Moreover, Borden testified that in response to her request to work on a "bigger" computer screen, Baynham "laughed and she said she didn't think it would be a problem," and thereafter, Borden "sometimes" used the "bigger" computer. Doc. 45-3 at 30. Borden's testimony suggests that BHC allowed her to use the "bigger" computer, and it does not indicate, as she asserts in her brief, that BHC prevented her from using the "bigger" computer when she needed it. Critically, Borden does not identify any instance in which Baynham refused to allow Borden access to the "bigger" computer screen, *see* doc. 52, and

bases her claim solely on her vague testimony.  Thus, on this record, Borden has failed to create a material dispute regarding whether BHC provided her with a reasonable accommodation.  Therefore, the failure to accommodate claim fails.

## V.

To close, BHC's motion for summary judgment is due to be denied as to the race and age discrimination claims based on BHC's failure to provide Borden with training it provided to similarly-situated employees outside of her protected classes. The motion is due to be granted, however, as to the claims of race and age discrimination based on Borden's alleged discharge and transfer to the clinic position, hostile work environment, retaliation, and disability discrimination and accommodation claims.  A separate order will be entered.

**DONE** the 20th day of May, 2020.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE